**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JANE DOE #9, | |
|       Plaintiff | |
| v. | Civil Action No. 4:19-cv-05016-AHB |
| WYNDHAM HOTELS & RESORTS, INC., ET AL., | |
|       Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSTION TO DEFENDANTS' MOTION TO DISMISS &**
**MOTION TO STRIKE PLAINTIFF'S SECOND AMENDED COMPLAINT**

## I.      SUMMARY

Wyndham[1] owns, manages, and operates hotels across the country.  One of those hotels is the La Quinta Inn & Suites located at 1625 W Loop S, Houston, Texas, 77027.[2]  Despite widespread knowledge of sex trafficking in the hotel industry[3] and specific knowledge as to sex trafficking at its properties,[4] including apparent signs at the subject property,[5] Wyndham chose to accept rental fees, licensing fees, management fees, and other benefits in exchange for providing rooms and privacy, which were ultimately used to facilitate sex trafficking by serving as the forum for such horrors to occur.[6] Jane Doe was trafficked at the subject property where she was repeatedly and brutally sexually assaulted.[7]

As a result of these actions and the trafficking of Jane Doe, she brings claims against

---

[1] "Wyndham" means Wyndham Hotels & Resorts, Inc. d/b/a La Quinta Inn and Suites, La Quinta Holdings, Inc. d/b/a La Quinta Inn and Suites, and CPLG TX Properties L.L.C. d/b/a La Quinta Inn and Suites.
[2] Second Amended Complaint [ECF 25], at ¶¶ 17-27.
[3] *Id.*, at ¶¶ 28-51.
[4] *Id.*, at ¶¶ 105-109.
[5] *Id.*, at ¶ 104.
[6] *Id.*, at ¶¶ 60-66; 112-122.
[7] *Id.*, at ¶ 104.

Wyndham under the TVPRA,[8] which extends civil liability to actors such as Wyndham who, while not a trafficker itself, knowingly benefit from participation in a venture that facilitates trafficking, such as the trafficking of Jane Doe.  Because Wyndham knowingly benefitted from participation in a sex trafficking venture, Jane Doe has stated a valid claim under the applicable pleading requirements as a victim of trafficking through that venture.

Wyndham seeks to dismiss Jane Doe's Second Amended Complaint (SAC) under Fed. R. Civ. P. 12(b)6 for failure to state a claim and requests that certain portions of the SAC be struck under Fed. R. Civ. P. 12(f).  In support of its Motion to Dismiss, Wyndham relies heavily on one favorable opinion from Georgia that dismissed (without prejudice) parent hotel defendants facing similar claims.[9]  However, as discussed below, that Court erroneously applied the wrong standard.[10]

Conveniently absent from Wyndham's Motion is any reference to several opinions denying dismissal of similar claims, which were discussed in Wyndham's original Motion to Dismiss.[11]  The sudden absence of these opinions when faced with an amended complaint is telling.[12] Unlike the Georgia opinion that applied the wrong standard, the majority of courts facing similar Motions to

---

[8] As used herein, TVPRA refers to the Trafficking Victims Protection Act (TVPA) of 2000, as amended and the TVPRA legislative package made up of four bills, including the Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018 (H.R. 2200), the Abolish Human Trafficking Act of 2017 (S. 1311), the Trafficking Victims Protection Act of 2017 (S. 1312), and the Trafficking Victims Protection Reauthorization Act of 2017 (S. 1862).

[9] While there were technically four opinions issued, they are substantially similar and were released on the same day by the same judge. *See Doe 1 v. Red Roof Inns, Inc.*, No. 19-3840, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020); *Doe 2 v. Red Roof Inns, Inc.*, No. 19-3841, 2020 WL 1872337 (N.D. Ga. Apr. 13, 2020); *Doe 3 v. Red Roof Inns, Inc.*, No. 19-3843, 2020 WL 1872333 (N.D. Ga. Apr. 13, 2020); and *Doe 4 v. Red Roof Inns, Inc.*, No. 19-3845, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020).

[10] That decision is currently on appeal. 20-11764, *Doe 1 v. Red Roof Inn, et al.*, filed on May 7, 2020, in the 11th Circuit Court of Appeals.

[11] ECF 13, at *10-11.

[12] This is particularly true here because in its original Motion to Dismiss, Wyndham complained about a lack of allegations. *See* ECF 13, at *11, note 3. Now that Plaintiff has amended her complaint to make her claims clearer, Wyndham seeks to have relevant allegations stricken. The reason for such a request is because, pursuant to the majority of authority, those allegations are sufficient to withstand Wyndham's 12(b)(6) Motion to Dismiss.

Dismiss have correctly declined dismissal. Such opinions include Ohio,[13] Pennsylvania,[14] and a tentative magistrate recommendation from Washington,[15] many of which involve Wyndham branded hotels and its current counsel. As explained herein, these opinions support the denial of Wyndham's Motion to Dismiss under 12(b)(6).

Jane Doe has adequately stated a claim under the TVPRA. This Court should follow the majority of district courts that have decided similar Motions to Dismiss and deny Wyndham's Motion to Dismiss. Similarly, denial of Wyndham's Motion to Strike under Rule 12(f) is also appropriate because in allowing similar claims to proceed, courts have relied on similar factual allegations as those challenged by Wyndham, including but not limited to knowledge of sex trafficking at the subject property and other branded locations[16] and accepting rental fees, licensing fees, management fees, and other benefits while ignoring obvious signs of sex trafficking.[17]

## II.        RELEVANT FACTS

At all material times, Wyndham owned, operated, and maintained control[18] over the operation of La Quinta located at 1625 W Loop S, Houston, Texas, 77027.[19] Sex trafficking was a well-known problem in the hotel industry of which Wyndham was aware.[20]

---

[13] *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 19-1194, 2020 WL 1244192 (S.D. Ohio, Mar. 16, 2020); *H.H. v. G6 Hospitality, LLC*, No. 19-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019); *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 19-849, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019).

[14] *A.B. v. Marriott Int'l, Inc.*, CV 19-5770, 2020 WL 1939678 (E.D. Pa. Apr. 22, 2020).

[15] *M.L. v. Craigslist, Inc.*, No. 19-6153 (W.D. Wash.) (report and recommendation from magistrate judge recommending denial of Wyndham's motion to dismiss).

[16] *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *3 ("Here, H.H. has alleged that Defendants were on notice about the prevalence of sex trafficking generally at their hotels… She also alleges facts specific to her own sex trafficking, including a number of signs she alleges should have alerted staff to her situation, and specific incidents in which hotel staff observed her abuse and failed to report it. These allegations are sufficient to meet the negligence standard in §1595 for purposes of surviving a 12(b)(6) Motion to Dismiss.").

[17] *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, at 965 ("M.A. has alleged that Defendants rented rooms to the trafficker, and therefore benefited financially. This Court finds that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the §1595(a) standard.").

[18] SAC, at ¶¶ 72-79.

[19] *Id.*, at ¶¶ 16-17; 52.

[20] *Id.*, at ¶¶ 28-51.

Specifically as to Jane Doe, she alleges that her trafficker would frequently use Jane Doe's identification card to secure hotel rooms at the subject property.[21]  As he did so, Jane Doe would be present next to him in the lobby while her trafficker secured rooms.[22]  Yet, no one at the hotel questioned the trafficker or asked Jane Doe why the trafficker was securing a room in her name, which is a recognized sign of sex trafficking.[23]Additionally, other signs of sex trafficking were readily present at the subject property, including but not limited to: excessive male traffic by non-patrons; patrons paying for rooms with cash; minors paying for hotel rooms; traffickers using victims' identities to book rooms; declining room service; high volumes of used condoms left in room; and other signs of sex trafficking. [24]

This was hardly a secret to Wyndham, as news stories dating back as far as 2011, prior to Jane Doe's trafficking, demonstrate knowledge of such conduct, and certainly establishes that Wyndham, at a minimum, should have known, of the use of its hotels for sex trafficking, as demonstrated by the following samples:[25]

- "Four Atlanta-area women have been arrested on prostitution charges at a local hotel as part of an FBI-led initiative targeting child exploitation and child prostitution nationwide. The women, ranging in age from 18 to 22, were arrested Friday, July 26, at LaQuinta Inn…";

- "After he dropped [the 15 year-old girl] off at the La Quinta Inn & Suites…last week, the girl solicited an undercover police officer for sex - and was promptly arrested as part of a nationwide FBI-led crackdown on child prostitution.";

- "Raleigh police responded to the La Quinta Inn…where the victim said she was forced into the commercial sex trade, the warrant said;"

- "On May 23, a 16-year-old Georgia girl was found inside the La Quinta Inn… [with a 61 year old man] in Tallahassee. Both were nude when officers with the Tallahassee Police Department arrived;" and

---

[21] *Id.*, at ¶ 84.
[22] *Id.*
[23] *Id.*
[24] *Id.*, at ¶ 104.
[25] *Id.*, at ¶ 105.

- A La Quinta "hotel has been ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel…must now install more security cameras and signs to deter criminal activity. The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."

This sampling of news stories shows Wyndham knew of sex trafficking at La Quinta hotels, including in Houston, Texas.[26]  Furthermore, Wyndham has been aware of sex trafficking occurring on La Quinta hotels through publicly available online review websites, which are regularly reviewed by companies such as La Quinta, as demonstrated by the following reviews:[27]

- Regarding a January 2009 stay at a La Quinta Inn in Elmsford, New York, a customer wrote: "Also to make my trip exciting was the hooker that keeps going to the back door to meet her [trick]. Blondie has quit a business going on I smoke so I would go outside to have a [cigarette] and a few times I was approached by her trick and would have to tell him she was at the door waiting. It was very uncomfortable. Even my pregnant daughter was approached. By our third night a new hooker had come to stay."

- Regarding a November 2013 stay at a La Quinta Inn in Milwaukee, Wisconsin, a customer wrote: "…The first thing I noticed when we pulled up was the obvious hooker outside… This hotel is SUPER gross. It's just a hang out for prostitutes and drug users. The staff is obviously either partaking, or allowing it to happen. Either way, this hotel management needs to think about hiring new people who won't turn their hotel into a sleazy, disgusting mess…"

- Regarding an August of 2014 stay at the La Quinta Inn in Fort Myers, Florida, a customer wrote: "There was very obvious prostitution going on while we were there. I spoke to the lady at the front desk about it and she said that they had began a "NO CASH" policy back in September of last year and it had helped with the drug dealings and prostitution a lot, but they couldn't completely eliminate it."

- "Unfortunately, this motel is used by many people who use drugs and many of the purchases occurred in the back parking lot. There were also prostitutes and their guests. If you're not into this I recommend you choose another motel."

Despite this widespread knowledge of sex trafficking, Wyndham knowingly profited by "catering to the needs of a criminal sub-culture that is looking for locations that will not actively

---

[26] *Id.*, at ¶ 106.
[27] *Id.*, at ¶ 107-109.

5

enforce laws against sex trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent sex trafficking and the sexual exploitation of trafficking victims on their property."[28]

In 2012, Jane Doe was trafficked at a La Quinta Inn, and Jane Doe's trafficker frequently used La Quinta hotels to traffic Jane Doe.[29] Jane Doe's trafficker was a La Quinta Returns member[30] and regularly used the subject property because members of the staff looked the other way, providing both access and security.[31] Jane Doe's trafficker used his La Quinta Returns account to rent rooms, and he accrued benefits for his frequent use of La Quinta hotels.[32] Using the room and privacy provided by Wyndham, Jane Doe was repeatedly and brutally sexually assaulted.[33]

To be clear, Jane Doe does not allege that the TVPRA requires Wyndham to take affirmative steps to prevent trafficking, but it certainly cannot look the other way while accepting profits. Possessing the requisite knowledge, Wyndham refused to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent the sexual exploitation of trafficking victims at their properties.[34] Instead, Wyndham chose profits.[35] Wyndham's knowing decision to benefit from the facilitation of sex trafficking led to Jane Doe's continued sexual exploitation and sexual assault at the subject property.[36]

### III.   ARGUMENT

#### A.   STANDARD OF REVIEW

In deciding a Motion to Dismiss, this Court must accept all well-pleaded facts as true and

---

[28] *Id.*, at ¶ 118.
[29] *Id.*, at ¶¶ 80-81.
[30] *Id.*, at ¶ 85.
[31] *Id.*, at ¶¶ 83; 87.
[32] *Id.*, at ¶ 86.
[33] *Id.*, at ¶ 111.
[34] *Id.*, at ¶ 89.
[35] *Id.*, at ¶¶ 117-121.
[36] *Id.*, at ¶ 89.

view those facts in the light most favorable to the plaintiffs. *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir.2008) (internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## B. THE SAC ADEQUATELY STATES A CLAIM UNDER THE TVPRA

The Trafficking Victim Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1591, *et seq.*, criminalizes the sex trafficking of children and the sex trafficking of adults by force, fraud, or coercion. Separately, § 1595 of the TVPRA provides victims of sex trafficking with a civil remedy against the perpetrators of sex trafficking or the beneficiaries of sex trafficking.  *See* 18 U.S.C. § 1595(a). Violation of the TVPRA 18 U.S.C. § 1595 explicitly and unequivocally states a beneficiary theory of liability against the Movants pursuant to § 1595 of the TVPRA, not a perpetrator theory of liability pursuant to § 1591. Despite the Movants efforts to conflate the Plaintiff's factual allegations pursuant to her stated beneficiary liability cause of action with a perpetrator liability cause of action, the Complaint clearly and sufficiently states a claim for relief under § 1595 of the TVPRA.

### 1. The relevant history of the TVPRA supports the denial of Wyndham's Motion to Dismiss.

Congress passed the Victims of Trafficking and Violence Protection Act in 2000 ("TVPA"). Pub. L. No. 106–386, 114 Stat. 1466 (2000) (codified as amended in Title 22, Chapter 78, and Title

7

18, Chapter 77, of the U.S. Code). The TVPA has been reauthorized several times in the years since including 2003, 2005, 2008, 2011, 2013, and 2017. With the enactment of the TVPA in 2000 and through its subsequent reauthorizations, Congress recognized that human trafficking constitutes "modern-day slavery." *See* Markup of H.R. 2620 before House Int'l Affairs Comm., 108th Cong., 1st Sess., at 298 (July 23, 2003) (statement of Rep. Christopher Smith). In both the text of the TVPA and the associated legislative history, Congress revealed a strong intent to provide a means of recovery for victims of sex trafficking by allowing them to pursue civil actions for human trafficking violations.

The 2003 version of 18 U.S.C. 1595(a) was a narrow remedial statute that looked solely to establish a statutory civil cause of action against perpetrators who were or could have been held criminally liable for their misconduct, to wit: "An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees." *See* Pub. L. No. 108–193, 117 Stat. 2878 (2003).  Under the 2003 language, only those criminally liable under § 1591 could be held civilly liable under § 1595. However, in 2008 18 U.S.C. 1595(a) was intentionally amended with substantially different language that created a category of defendants that could be held liable civilly even in the absence of criminal culpability.

By amending 18 U.S.C. § 1595 in 2008 as part of the Trafficking Victim Protection Reauthorization Act ("TVPRA"), Congress required "whoever," *i.e.*, all businesses, including those in the hospitality industry, to comply with the new law or face new civil liability. *See* Amended Pub. L. No. 110–457, title II, § 221(2), Dec. 23, 2008 (the TVPRA was amended "by inserting '(or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)' after 'perpetrator'"). This amendment to the country's leading human trafficking legislation

necessitated a paradigm shift in the hospitality industry.[37] Since this amendment to the TVPRA, some businesses in the hospitality industry have elected to comply with § 1595, as amended, while others have chosen not to comply.

Compliance with the TVPRA requires businesses, including businesses in the hospitality industry, to conduct a proactive analysis to determine whether the business financially benefits from participation in a sex trafficking venture. Businesses in the hospitality industry must take affirmative steps to determine whether they financially benefit from sex trafficking - and if so, prevent sex trafficking on their properties and thus the attendant financial benefit derived from the occurrence of sex trafficking. To make this determination - to find out what they should know - brand managers and branded properties within the hospitality industry must exert some meaningful effort to apprise themselves of the activities - especially flagrant criminal activities - on location at their hotel properties.

It is axiomatic that the effects of sex trafficking are devastating to its victims. And it is facially evident that in amending the TVPRA in 2008, Congress attempted to address these devastating effects by providing a ten (10) year statute of limitations for sex trafficking claims because the trauma and harm sex trafficking inflicts on its victims are typically so debilitating that survivors face severe mental and emotional struggles that impact whether they decide to pursue a civil claim, sometimes for years. This ten (10) year statute of limitations accounts for survivors' understandable struggles with the decision to pursue litigation which are only compounded by the corresponding difficulties in obtaining remedies from the financial beneficiaries of sex trafficking - such as Wyndham. In light of

---

[37] For example, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, introduced a paradigm shift by requiring change nationally across all business sectors. Employers could no longer discriminate  on the basis of race, religion, sex, or national origin. *Id*. Employers were of course free to maintain the status quo  and continue to discriminate against their employees, but because of the new law they were liable for damages on a going forward basis for continuing to discriminate after its prohibition. Similarly, hotels are free to maintain the pre-amendment status quo and do nothing when they know sex trafficking is occurring on their hotel properties and continue to accept profits, but doing so after the amendment to § 1595 of the TVPRA exposes such beneficiaries to liability.

the harsh realities of sex trafficking - both the horrors of its perpetrators' misconduct and the unimaginable trauma to its victims - Congress enacted a very broad remedial law, as of 2008, that imposed liability on businesses, such as those in the hospitality industry, that facilitate and financially benefit from sex trafficking.

The Plaintiff's assertions of the significance of this change in the statutory language are supported by well-established principles of statutory interpretation. As a general rule, when interpreting a statute, one must "consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." *Holloway v. United States*, 526 U.S. 1, 6 (1999) (internal citation and quotations omitted); *see also Williams v. Taylor*, 529 U.S. 362, 364 (2000) ("In light of the cardinal principles of statutory construction that courts must give effect to every clause and word of a statute."). There is "a canon of construction that remedial statutes should be liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65 (1968). This canon of statutory construction is especially applicable to the TVPRA considering that the language of 18 U.S.C. §1595(a) was amended in 2008 to be even broader, for when a "statute is remedial in nature, its terms must be construed in a liberal fashion." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985).

### 2.   Wyndham accepted profits from room rentals, licensing and management fees; thus, it knowingly received benefits violation of §1595.

Although the law changed, Wyndham chose not to. The Congressionally mandated mechanism to civilly enforce the TVPRA is explicitly stated in § 1595. Since 2008, victims of sex trafficking have been empowered to bring civil claims against whoever financially benefits from what they should have known was a sex trafficking venture. The Plaintiff has plausibly alleged these Defendants should have known they financially benefitted from their participation in a sex trafficking venture. *See, e.g.*, ECF 25, at ¶¶ 115-121.

Since 2008 there have been at least three distinct causes of action under § 1595: 1) § 1595 perpetrator trafficking claims against a person who directly violates § 1591(a)(1); 2) § 1595

perpetrator financial beneficiary claims against a person who directly violates § 1591(a)(2); and 3) § 1595 financial beneficiary claims against a civil defendant who has not violated § 1591 at all, but who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter." *See* 18 U.S.C.A. § 1595(a) (emphasis added).

A financial beneficiary claim, as alleged in this case, differs from the perpetrator claims in important ways.[38] In the 2008 amendment to the TVPRA, Congress determined that civil liability would attach to a financial beneficiary if that person or entity knew or should have known the venture in which it was engaged involved a violation of the TVPRA. A financial beneficiary claim, therefore, need not allege knowing assistance or actual knowledge that the venture in which it participated violated the TVPRA, only that the entity should have known the venture from which it benefitted violated the TVPRA. By providing an explicit constructive knowledge standard, Congress determined the definition of "participation in a venture" from § 1591(e)(6) did not apply to financial beneficiary claims under § 1595. Thus, a financial beneficiary claim has three elements: (1) a knowing benefit; (2) participation in a venture; (3) that the person or entity knew or should have known the venture engaged in a violation of the TVPRA. *See* 18 U.S.C. § 1595(a).

Courts evaluating similar claims have held that section "1595(a) does not impose an actual knowledge requirement." *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2:19-CV-1194, 2020 WL 1244192, at *5 (S.D. Ohio Mar. 16, 2020). The knowledge element merely requires that a Defendant knowingly receive a financial benefit, not that it has actual knowledge of the sex trafficking venture. *Id.* "[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to

---

[38] While Jane Doe uses the term "perpetrator" when referring to Wyndham (ECF 25, at ¶114), it is used in the context of a financial beneficiary claim, as it cites to §1595a, which states…. "perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)…"

meet this element of the § 1595(a) standard." *Id.* (citing *M.A.*, 2019 WL 4929297 at *3; *H.H.*, 2019 WL 6682152 at *2; *see also Gilbert v. United States Olympic Committee*, No. 18-cv-00981-CMA-MEH, 2019 WL 4727636, at *16 (D. Colo. Sept. 27, 2019) (finding the forced labor provision of § 1589(b) does not "require[ ] the party to benefit from the [forced] labor or services for liability to attach")).

Here, Jane Doe has alleged that Wyndham knowingly received benefits in the form of rental fees, licensing fees, management fees, and other benefits. *See, e.g.,* ECF 25, at ¶¶ 60-66; 117-121. More specifically, Wyndham financially benefitted from "[e]ncouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims, including Jane Doe, due to La Quinta's lack of measures against the sexual exploitation of trafficking victims and sex trafficking." *Id*., at ¶ 118. Therefore, Jane Doe has satisfied the knowing benefit element to survive Wyndham's Motion to Dismiss.

3.    **Wyndham knew or should have known of its participation in a sex trafficking venture in violation of §1595.**

"Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence" sufficient to survive a 12(b)(6) Motion to Dismiss on claims under 1595a. *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, at *6 (citing *M.A.*, 2019 WL 4929297 at *6 (citing *Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007) (finding that a "willful blindness policy" could be sufficient to show a RICO violation)). The Court in *Doe S.W. v. Lorain-Elyria Motel, Inc.* found that allegations similar to those made by Jane Doe here were sufficient to meet the negligence standard in § 1595 for purposes of surviving a 12(b)(6) Motion to Dismiss. *Id.* More specifically, the Court noted that hotel defendants "were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence." *Id.* Those allegations are

present here, as Plaintiff has alleged that Wyndham failed to implement appropriate policies, provide adequate training, or otherwise act as a reasonably prudent hotel.[39]

Like the plaintiff in *Doe S.W.*, Jane Doe also alleges facts specific to her own sex trafficking, including a number of signs she alleges should have alerted staff to her situation.[40] These allegations are sufficient to survive a 12(b)(6) Motion to Dismiss.[41]

Similarly, a defendant "need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless." *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2:19-CV-1194, 2020 WL 1244192, at *7 (S.D. Ohio Mar. 16, 2020). The plaintiff there "alleged sufficient facts" to show Defendants "participated in a venture" under § 1595 by "alleging that Defendants rented rooms to people it knew or should have known were engaged in sex trafficking. These acts and omissions by Defendants, Doe alleges, facilitated the sex trafficking venture." *Id.* The court further noted that, at a minimum, a plaintiff "must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *Id.* Like *Doe S.W.*, Jane Doe has made allegations sufficient to survive a 12(b)(6) Motion to Dismiss.[42]

### 4. Wyndham attempts to apply the wrong standard of knowledge to avoid liability.

In an effort to avoid the precedents discussed above, Wyndham misapplies the legal standard of knowledge that a Plaintiff must allege in a suit against a beneficiary under § 1595, so Jane Doe will address this critical conflation.

---

[39] SAC, at ¶¶ 93-110.
[40] *Id.,*, at ¶¶ 80-89; 103-104.
[41] *See H.H. v. G6 Hospitality, LLC*, No. 19-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019); *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 19-849, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019); *A.B. v. Marriott Int'l, Inc.*, CV 19-5770, 2020 WL 1939678 (E.D. Pa. Apr. 22, 2020); *M.L. v. Craigslist, Inc.*, No. 19-6153 (W.D. Wash.) (report and recommendation from magistrate judge recommending denial of Wyndham's motion to dismiss).
[42] SAC, at ¶¶ 84-89; 110-111.

The legal standard stated in *Noble v. Weinstein,* upon which Wyndham (ECF No. 27 at *10)[43] and the Georgia opinion rely,[44] is not applicable to this case. *See* ECF No. 27 at 10.[45]  Defendants are liable for Plaintiff's damages if they: (1) knowingly benefitted; (2) from participation in a venture; (3) that they knew *or should have known* engaged in sex trafficking. 18 U.S.C. § 1595(a) (*emphasis added*).

Noble is inapposite because the plaintiff in *Noble* did not allege that any defendant in that case "should have known" anything. *Noble* brought only perpetrator claims against the defendants in that case.[46] The plaintiff in *Noble* did not allege a single financial beneficiary claim under § 1595. Perpetrator claims are separate and distinct from financial beneficiary claims. *See, e.g.*, *Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1312 (M.D. Ga. 2018) ("...Plaintiffs' Complaint arguably alleges a cause of action against CoreCivic as both a perpetrator and as a financial beneficiary."). Because the plaintiff's claims in *Noble* alleged only that the defendants were the actual perpetrators of violations of § 1591, the plaintiff had to prove those violations against the defendants. To do so, § 1591, a criminal statute, explicitly requires a showing of at least "reckless disregard."

Section 1595 explicitly does not require a showing of "reckless disregard" and does not restrict civil suits only against defendants who have actually violated § 1591 themselves. "Reckless disregard" and "should have known" are not interchangeable levels of scienter. Reckless disregard is

---

[43] Wyndham contends as follows: "Absent specific allegations tying a particular defendant to a particular trafficker and victim – i.e., absent allegations of a defendant's knowing benefit from and participation in a sex trafficking venture – there is no basis to state a claim under the TVPRA, and Plaintiff's Complaint should be dismissed."  As explained in this Response, this is not accurate.

[44] *See, e.g., Doe 1 v. Red Roof, et. al.,* 2020 WL 1872335 (N.D.Ga.), at *3(citing *Noble v. Weinstein,* 335 F.Supp.3d 504, 524 (S.D.N.Y. 2018)("…knowledge and some participation in the sex trafficking act itself must be shown.").

[45] Wyndham contends as follows: "Absent specific allegations tying a particular defendant to a particular trafficker and victim – i.e., absent allegations of a defendant's knowing benefit from and participation in a sex trafficking venture – there is no basis to state a claim under the TVPRA, and Plaintiff's Complaint should be dismissed."  As explained in this Response, this is not accurate.

[46] The counts pled in *Noble* were specifically: (1) "Violation of 18 U.S.C. § 1591"; (2) Participation in a Venture in Violation of 18 U.S.C. § 1591"; (3) Participation in a Venture in Violation of 18 U.S.C. § 1591"; (4) Aiding and Abetting Violation of 18 U.S.C. § 1591"; (5) Aiding and Abetting Violation of 18 U.S.C. § 1591". *See* Pl. Ex. 3, Compl., *Noble v. Weinstein*, No. 1:17-cv-09260-RWS (Feb. 20, 2018).

conscious indifference, while "should have known" is the well-known and referred to as constructive knowledge. *See Brewster v. La Quinta Inns, Inc.*, 142 F.3d 432 (6th Cir. 1998) (analyzing a hotel's duty of care under Louisiana negligence law, the Sixth Circuit explained the standard as "should have known (*i.e.*, had constructive knowledge)"). Constructive knowledge is the "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019).

A defendant's knowledge of the nature of the sex trafficking venture is required for a criminal conviction under § 1591. This *mens rea* standard is referenced explicitly in the definition of § 1591(e)(4): "The term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." All of the definitions in § 1591 are expressly limited to the criminal context at issue in § 1591 by subsection § 1591(e) which begins, "In this *section*..." (emphasis added).

Furthermore, while courts at times may "presume that the same term has the same meaning when it occurs here and there in a single statute," that is not an "irrebuttable" presumption, but instead "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (quoting *Atlantic Cleaners and Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). The Supreme Court has unanimously agreed that it "understand[s] that '[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section.'" *Id.* (quoting *Atlantic Cleaners and Dyers, Inc. v. United States*, 286 U.S. at 433). The Supreme Court further explained:

> The point is the same even when the terms share a common statutory definition, if it is general enough, as we recognized in *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). There the question was whether the term "employees" in § 704(a) of Title VII of the Civil Rights Act of 1964 covered former

employees. Title VII expressly defined the term "employee," 42 U.S.C. § 2000e(f), but the definition was "consistent with either current or past employment," 519 U.S., at 342, 117 S.Ct. 843, and we held that ***"each section" of Title VII "must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute,"*** *id.,* at 343–344, 117 S.Ct. 843.

*Id.* (emphasis added). These principles are especially true when "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

The plain language of § 1595 irrefutably demonstrates that the definition of "participation in a venture" from § 1591(e)(4) cannot apply to "participation in a venture" as used in § 1595(a). If the definition from § 1591 did apply, civil liability would be limited only against a criminal perpetrator and most of § 1595(a)—everything in parentheses—would be rendered meaningless. This interpretation cannot apply because courts must "avoid a reading which renders some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). For example,

> If "communication" included every written communication, it would render "notice, circular, advertisement, [and] letter" redundant, since each of these are forms of written communication as well. Congress with ease could have drafted § 2(10) to read: "The term 'prospectus' means any communication, written or by radio or television, that offers a security for sale or confirms the sale of a security." ***Congress did not write the statute that way, however, and we decline to say it included the words "notice, circular, advertisement, [and] letter" for no purpose.***

*Id.*) (emphasis added). *See also United States v. Ballinger,* 395 F.3d 1218, 1236 (11th Cir.2005) ("statutes should be construed so that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *United States v. Aldrich*, 566 F.3d 976, 978–79 (11th Cir. 2009)). The words "should have known" in § 1595(a) were not included by Congress for no purpose.

Defendants repeatedly elide the specific and clear differences between criminal liability and associated civil claims against perpetrators under § 1591 and civil liability of beneficiaries under § 1595. In order to state a claim, the Plaintiff must merely allege that Defendants should have known

they were benefitting financially from a sex trafficking venture. The Plaintiff has so alleged.

## C.    THE SAC IS NOT A "SHOTGUN PLEADING"

In an analogous case in which the "shotgun pleading" issue was addressed, the allegations in the complaint contained "sufficient specificity to address the notice concerns that Rule 8 is designed to protect." *M.A.,* 425 F. Supp. 3d 959, 973. In support of its ruling, the court noted "allegations specific to Wyndham, including that Wyndham 'knew or should have known' about sex trafficking generally at its properties and in the area, and that Wyndham 'failed to take adequate measures to prevent the sex trafficking of the Plaintiff.'" *Id.* In summarizing its decision, the Court noted that "this is not a situation where defendants '[were] not even mentioned in the body of the complaint.'" *Id.*

Here, as in *M.A.*, Jane Doe has provided allegations in her Second Amended Complaint that contain sufficient specificity to address the notice concerns that Rule 8 is designed to protect. More specifically, Jane Doe has alleged that each of the Defendants - Wyndham Hotels & Resorts, Inc. (WHRI); La Quinta Holdings, Inc. (LQH); and CPLG TX Properties L.L.C. (CPLG) - owned, operated, and/or controlled the subject property,[47] that they should knew or should have known about sex trafficking,[48] that they benefitted from the rental of rooms,[49] and that they failed to take adequate measures to prevent the sex trafficking of Jane Doe.[50]

The extent to which each of the defendants played such roles at the subject property can be resolved through discovery and each of the Defendants seems to know what role they played, as they have formulated a response in the form of a Motion to Dismiss.[51] Contrary to Wyndham's assertion,

---

[47] At this stage of the litigation, it would be premature to state *exactly* what entity was responsible for the relevant operations of the subject property, as that is what discovery is for, especially given the complicated relationship between the defendants. *See, e.g.,* ECF 25, at ¶¶ 60-66.

[48] *See* Section III(B)(3), *supra.*

[49] *See* Section III(B)(2), *supra.*

[50] *See* Section III(B)(3), *supra.*

[51] In addition to the facts described in note 53, *supra*, the SAC contains a number of allegations supporting an agency relationship by and between the defendants. *See, e.g.,* ECF 25, at ¶¶ 56-79.  Combined with the allegations of ownership, operation, management, and control, these facts are more than sufficient to overcome any alleged

the SAC is not calculated to "confuse the 'enemy,' and the court." ECF 27, at *6.[52]  To the contrary, Wyndham was able to craft a specific Motion to Dismiss in response to the claims, which "may explain why [Wyndham] did not move for a more definite statement under Federal Rule of Civil Procedure 12(e) or otherwise assert that they were having difficulty knowing what they were alleged to have done and why they were liable for doing it." *Weiland*, 792 F.3d 1313, at 1324.  Wyndham did not do so because it clearly has notice of and understand the claims against it.

## D.    RULE 12(F) IS NOT APPLICABLE TO THE SAC

Federal Rule of Civil Procedure 12(f) provides that a district court "may strike from a pleading... any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Although it is within the court's discretion to strike a pleading, that authority should be exercised with caution. *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012). A motion to strike based on immateriality or impertinency " 'should be granted only when the pleading to be stricken has no possible relation to the controversy.' " *Id.* (quoting *Augustus v. Bd. of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir. 1962)); *see Rizzo v. Blues Mgmt., Inc.*, 4:16-CV-01017, 2017 WL 549016, at *5 (S.D. Tex. Jan. 24, 2017), report and recommendation adopted sub nom. *Rizzo v. Blues Mgmt.*, 4:16-CV-1017, 2017 WL 544590 (S.D. Tex. Feb. 9, 2017)(only striking allegations that "have no apparent or implicit relevance to the claims or defenses alleged in the pleadings"). Because striking a portion of a pleading is a drastic remedy, and, because it is often sought by the movant "simply as a dilatory

---

deficiencies, as Texas recognizes principal liability for agents under such circumstances.  Apparent authority in Texas may arise either from a principal knowingly permitting an agent to hold herself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority she purports to exercise. *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984).  Actual authority includes both express and implied authority and usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses. *2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.). A principal is liable for his agent's acts which the agent has actual or apparent authority from the principal to do, and for acts which the principal ratifies. *Cameron County Sav. Ass'n v. Stewart Title Guar. Co.*, 819 S.W.2d 600, 602 (Tex.App.—Corpus Christi 1991, writ denied).

[52] Citing *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015).

tactic," motions brought under Rule 12(f) are viewed disfavorably and are rarely granted. *Centex Homes v. Lexington Ins. Co*, No. 3:13–cv–719–BN, 2014 WL 1225501, at *12 (N.D. Tex. Mar. 25, 2014) (citing *Jacobs v. Tapscott*, No. 3:04–cv1968–D, 2004 WL 2921806, at *2 (N.D. Tex. Dec. 16, 2004).

As noted above, the challenged facts have been relief upon by numerous courts across the United States as a basis to deny similar Motions to Dismiss; therefore, it is hard to see how these allegations could be categorized as "redundant, immaterial, impertinent, or scandalous matter." Accordingly, Wyndham's drastic request under Rule 12(f) should be denied.

## IV.    CONCLUSION

Jane Doe's Second Amended Complaint meets the pleading requirements under the Federal Rules of Civil Procedure.  Consistent with the majority of applicable case law, Jane Doe's Second Amended Complaint contains sufficient factual allegations to overcome a 12(b)(6) Motion to Dismiss her claims under the TVPRA, and the factual allegations challenged by Wyndham are similar to those relied upon by other courts in ruling on similar motions.  Accordingly, Wyndham's 12(b)(6) Motion to Dismiss and 12(f) Motion to Strike must be denied.

Respectfully submitted,

ANNIE MCADAMS PC

By: /s/ Annie McAdams
　　　ANNIE MCADAMS, PC
　　　Annie McAdams
　　　State Bar No. 24051014
　　　S.D. Tex. No. 1514589
　　　1150 Bissonnet
　　　Houston, Texas 77005
　　　Telephone: (713) 785-6262
　　　Facsimile: (866) 713-6141
　　　annie@mcadamspc.com

　　　and

By: /s/ David E. Harris

SICO HOELSCHER HARRIS LLP
David E. Harris
State Bar No. 24049273
S.D. Tex. No. 712461
802 N. Carancahua, Ste. 900
Corpus Christi, Texas 78401
Telephone: (361) 653-3300
Facsimile: (361) 653-3333
dharris@shhlaw.com

and

THE GALLAGHER LAW FIRM
Michael T. Gallagher
State Bar No. 07586000
S.D. Tex. No. 5395
Pamela McLemore
State Bar No. 24099711
2905 Sackett Street
Houston, Texas 77098
Telephone: (713) 222-8080
Facsimile: (713) 222-0066
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR JANE DOE #9**

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing Plaintiff's Response to Defendants' Motion to Dismiss & Motion to Strike Plaintiff's Second Amended Complaint was electronically filed through the CM/ECF system to all parties through their counsel of records this 28th day of May, 2020.

*/s/ David E. Harris*
David E. Harris